NOTICE

Decision filed 05/27/22. The text of this decision may be changed or corrected prior to the filing of a Petiion for Rehearing or the disposition of the same.

2022 IL App (5th) 220011-U

NOS. 5-22-0011, 5-22-0012 cons.

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* M.M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Coles County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | Nos. 20-JD-80, 20-JD-88 |
| v. | ) | |
| | ) | |
| M.M., a Minor, | ) | Honorable |
| | ) | Jonathan T. Braden, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Cates and Moore concurred in the judgment.

**ORDER**

¶ 1   *Held*: The trial court's finding that the State proved by a preponderance of the evidence that the delinquent minor violated the conditions of her probation was not against the manifest weight of the evidence, and the court did not abuse its discretion in sentencing her to an indeterminate period in the Illinois Department of Juvenile Justice. Thus, the court's decision is affirmed.

¶ 2   On October 15, 2020, the respondent, M.M., was charged in a delinquency petition with domestic battery and aggravated battery in case No. 20-JD-80. On November 5, 2020, she was also charged in another delinquency petition with domestic battery, aggravated

battery, and resisting or obstructing a police officer in case No. 20-JD-88.[1]  Thereafter, M.M. admitted the allegations to all counts in both cases.  Based on this admission, the circuit court of Coles County imposed a two-year term of probation.  The State subsequently filed a petition to revoke and a supplemental petition to revoke probation in both cases.  The trial court found that M.M. violated her probation and sentenced her to an indeterminate term in the Illinois Department of Juvenile Justice (Department).  M.M. appeals, contending that (1) the trial court erred in characterizing her letter written after sentencing as a *pro se* notice of appeal instead of a *pro se* motion to reconsider her sentence, (2) the court's finding that the State proved by a preponderance of the evidence that she violated the conditions of her probation was against the manifest weight of the evidence, and (3) the court abused its discretion in sentencing her to an indeterminate period in the Department.  For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On October 15, 2020, the State filed a petition alleging that M.M., born April 23, 2004, was delinquent because on August 27, 2020, she committed the offenses of domestic battery and aggravated battery in that she made physical contact with a family member (her grandmother and guardian), who was 60 years old or older.  On November 5, 2020, the State filed a second petition alleging that M.M. was delinquent because on November 4, 2020, she committed the offenses of domestic battery, aggravated battery, and resisting or

---

[1]Initially, case No. 20-JD-80 was docketed in this court as 5-22-0011, and case No. 20-JD-88 was docketed as 5-22-0012.  However, on March 8, 2022, this court entered an order consolidating the appeals under 5-22-0011.

obstructing a police officer in that she pushed and hit her younger sister; she kicked her grandmother in the waistline; and, when she was being arrested, she pulled her arms away, thrashed her upper body, and tried to thwart the officer's attempts to get her inside the police car.

¶ 5 On January 29, 2021, M.M. admitted the allegations in both petitions. Based on those admissions, the trial court sentenced her to a two-year term of probation under the following conditions, in pertinent parts, outlined in the Juvenile Certificate of Conditions. For example, paragraph 5 required M.M. to reside with her parents, guardian, or legal custodian. Also, paragraph 7 required M.M. to keep her probation officer advised of her place of residence at all times, advise the probation officer prior to any change of residence, and be at her residence between the hours of 9 p.m. and 6 a.m. Sunday night through Saturday night unless modified by probation.

¶ 6 On August 12, 2021, the State filed a petition to revoke and a supplemental petition to revoke M.M.'s probation. Attached to the petitions was an affidavit from Ashley Johnson, M.M.'s probation officer, in which she stated that she received a telephone call from M.M.'s grandmother on August 2, 2021. In the telephone call, M.M.'s grandmother advised that M.M. had been missing since July 30, 2021, and a missing person report was filed with the local police department. Johnson also indicated that M.M. had been in violation of her curfew on several occasions in the last month. Also attached was a supplemental probation violation report, which indicated that M.M. violated her probation by failing to be at her residence by 9 p.m. on several days identified in the report.

¶ 7    At the October 22, 2021, hearing, Johnson testified that M.M. admitted that, on occasion, she was not home by her 9 p.m. curfew, and there were some nights when she never went home. Johnson also testified that she conducted home visits, and there were times when M.M. was not at home when she was required to be there. However, Johnson could not remember the specific dates of the home visits. Johnson explored every option with M.M. to get her to comply with probation; Johnson had numerous one-on-one meetings with her, tried to convince her to keep taking her medication for her mental health, worked with her grandmother, and attempted to get her into counseling. Johnson explained that M.M. stayed on track and was a functioning member of society when on her medication. M.M. also served detention time for noncompliance with probation with the hope that the detention would turn her around. After exhausting every option, Johnson filed the probation violation reports. No other evidence was presented by the State or M.M.

¶ 8    After hearing the testimony and arguments from counsel, the trial court found that the State had proven by a preponderance of the evidence that M.M. failed to observe her curfew. In making this decision, the court noted that there was testimony presented, although it was general testimony, that Johnson was present in M.M.'s home at times when M.M. was required to be there and was not. The court also noted that M.M. admitted to Johnson that she failed to observe her curfew. The court found this evidence was unrebutted. The court indicated that the allegation in the petition to revoke regarding the curfew violations included specific dates, but it was not convinced that only those specific dates must be proven to establish a probation violation. Since M.M. admitted to failing to observe her curfew, and Johnson had firsthand knowledge of M.M. violating her curfew,

4

the court found that the State had met its burden on this claim. However, the court found that the State had not met its burden on the second claim, *i.e.*, that M.M. failed to reside with her guardian. The court then granted the State's petition to revoke on the first claim.

¶ 9 On November 8, 2021, Johnson filed the social history investigation report that she prepared, which stated that M.M. had 9 police contacts in 2019, 71 in 2020, and 25 in 2021; M.M. was diagnosed with bipolar disorder and was prescribed medications; and she was not currently taking her medications because she felt like they were not doing anything for her. M.M. was primarily raised by her maternal grandmother and had resided with her grandmother since she was three years old. She had no relationship with her biological father, and she characterized her relationship with her mother as decent. She had four half-siblings, who also resided with her grandmother, and she did not have a good relationship with her oldest sister. The report indicated that the constant disrespect for the rules of the home, the ongoing chaos and disruption, and the threats of physical violence had taken an emotional toll on M.M.'s grandmother and oldest sister and impacted their health. M.M. had been suspended from school on several occasions and was currently refusing to attend her high school because she wanted to attend a different school.

¶ 10 Johnson indicated that she first started supervising M.M. when M.M. was 16 years old. Johnson noted that M.M. struggled over the past year with following the conditions of probation; she had ongoing issues with school attendance and following the rules at school; and she refused to comply with her court-ordered curfew, sometimes coming home well past her curfew or not coming home at all. Johnson acknowledged that M.M. suffered from mental health issues and was prescribed medication, but she made a choice not to take

it as directed. When M.M. was taking her medication as directed, she was stabilized; she functioned well in the community, at school, and at home; and she made better life choices. However, once she stopped taking her medication, her life fell apart. Johnson indicated that M.M. lacked impulse control and skills in problem solving, decision making, and communication. She also placed herself in situations with older peers, who negatively impacted her behavior. However, she tested negative on her recent drug and alcohol screens.

¶ 11    At the December 8, 2021, sentencing hearing, Stacey Hackett, a special education teacher and head of the emotional disability transition program (ED program) at Charleston High School, testified that M.M. had been in the ED program since 2019. Hackett was her case manager; as a case manager, Hackett figured out M.M.'s schedule, talked with her about her behavioral issues, and determined consequences for behavioral issues. During the COVID-19 pandemic, the school was doing remote learning. However, because M.M. struggled with remote learning and was not taking it seriously, the decision was made to bring her back into school for in-person learning. After bringing her back, she was initially doing great and taking her medication, but her good behavior only lasted for approximately one month.

¶ 12    On October 8, 2021, Hackett sent a letter to M.M.'s probation officer about M.M.'s behavior. Hackett noted that M.M. indicated that she quit taking her medication, she was verbally combative, she did not want to follow the rules or be at school, and there were numerous issues with her wearing inappropriate clothing to school. Hackett also noted that, when M.M. was on her medication, her behavior was drastically improved; she was

6

easier to get along with, her demeanor was better, her books were ready for class, and her schoolwork was completed. When she was not taking her medication, she was more argumentative, she did not want to be at school and wanted to be at home, and she was tired. M.M. was suspended twice during the 2021-22 school year for refusing to give up her cell phone while in the alternative education room. Hackett explained that students were placed in the alternative education room as a consequence, and phones were not allowed in there. After her second suspension on October 4, she never returned to school and was not doing remote learning. Although M.M. was a senior, she was not set to graduate in May. She would need approximately 1½ to 2 years more to graduate.

¶ 13    Johnson testified that M.M. had been on probation since January 29, 2021. During that time, M.M. failed to comply with curfew, would not come home at night, and had issues with school attendance. M.M. had no issues with drugs and alcohol until recently. In October 2021, she admitted to drinking alcohol and some cocaine use. She was regularly attending her mental health counseling because her grandmother would take her. Johnson explained that M.M. would go into detention and get back on her medication, and, once she was released, she would do well until she quit taking her medication again. Johnson also explained that electronic home confinement, nonelectronic home confinement, curfew, and detention had all been utilized to attempt to improve M.M.'s behaviors; everything except for being sentenced to a term in the Department had been attempted. Johnson indicated that probation had given M.M. every opportunity to change and make better choices.

¶ 14    Malia M., M.M.'s grandmother, testified that she had been M.M.'s guardian since M.M. was three years old.  Malia M. indicated that, if M.M. was released from custody, M.M. would be welcome in her home because M.M. was her granddaughter, and she had no other choice.  However, she indicated that M.M. would not be welcome at her house after M.M. turned 18 unless M.M. was able to obey the rules.  She explained that she did everything she could for M.M., it had been a "living hell" with M.M., and she just wanted some peace.  She further explained that M.M. was no longer allowed to control her home and do whatever M.M. wanted while living there.

¶ 15    M.M. then read her written statement, in which she expressed remorse for not following the rules at home and school and for not taking her medication.  She indicated that, in the future, she would think before acting and try to consistently take her medication, which would help her follow the rules and control her anger.

¶ 16    After the testimony and M.M.'s statement, the State asked for an indeterminate sentence in the Department.  In support, the State argued that M.M. had been given every opportunity by the trial court to correct her behavior; she was on electronic home confinement for weeks at a time and, although it kept her at home, it did not curb her disrespectful behavior; she pled guilty to violent crimes against her closest family members; and M.M.'s behavior negatively impacted both her grandmother and her sister. The State also argued that, while in court, M.M. promised to follow the rules, but she never followed through on those promises.  She quit taking her medication, fought with people at school, stopped attending school, came home at all hours of the night, had numerous police contacts in two years, and had a 33-year-old boyfriend who gave her alcohol and

cocaine. The State argued that the only remaining option was to send her to the Department.

¶ 17   In response, M.M.'s counsel asked for M.M. to be sentenced to probation. He noted that, throughout M.M.'s probation, she had not been charged with any new offenses, and the petition to revoke was for a violation of curfew. He argued that, although she had several police contacts, a police contact was just where the police showed up to help. He acknowledged that she struggled in school but noted that was not uncommon for children in the program. He argued that probation would put her back on the right path and that electronic home confinement had previously worked with her.

¶ 18   After hearing the arguments, the trial court noted that M.M.'s case had been ongoing for almost two years, there had been many conversations with her about changing her behavior, and the trajectory of her behavior and compliance had been going steadily downhill with some ebbs and flows. The court also noted that M.M. consistently admitted to her poor behavior when in court; at the outset of the case, she expressed genuine remorse for her behavior and a commitment to change; and, at that time, the court had faith that she was going to improve as promised, so she was given numerous opportunities to make those changes.

¶ 19   As the case progressed, the trial court observed changes in her behavior and in her interactions, and, although she still expressed remorse for her behavior, the court no longer believed her remorse was genuine. The court felt that she was being manipulative to get a favorable outcome. When the manipulations no longer worked, the court observed a change in her behavior; she became indifferent and defiant. The court noted that the last

time M.M. was taken into custody, she shrugged her shoulders as if she did not care. The court found it troubling that the case had progressed in this manner and noted that the defiance extended to every part of M.M.'s life. The court also noted that she was disrespectful to her teachers, made no effort to follow the rules while at school, and stopped attending school. She was engaging in high-risk behavior, was self-destructive, and was putting herself in a position to be harmed.

¶ 20 The trial court expressed that it was sensitive to the fact that M.M. suffered from mental health issues and believed that it impacted her ability to follow the rules, but she refused to consistently take her medication. The court indicated that it did not have faith that M.M. would comply with the terms of probation and sentencing her to the Department was disappointing, but it did not know what else to do because there were no other viable alternatives. The court then sentenced her to an indeterminate term in the Department.

¶ 21 Thereafter, the trial court entered a written order of commitment to the Department, finding that commitment was necessary to ensure the protection of the public from the consequences of M.M.'s criminal activity and reasonable efforts had been made to prevent or eliminate the need for M.M. being removed from the home. On January 7, 2022, M.M. wrote a *pro se* letter that was filed with the court, in which she indicated that she wanted to appeal her case so she could prove that she could follow the rules, be with her family at home, obtain employment and a general educational development degree, and stay out of trouble. The letter was characterized as a *pro se* notice of appeal.

¶ 22                                    II. ANALYSIS

¶ 23    Initially, M.M. contends that her *pro se* letter filed with the circuit court should have

been characterized as a motion to reconsider her sentence rather than a notice of appeal.

However, M.M. has not cited to any authority to support her argument that the trial court

erred in treating her *pro se* letter as a notice of appeal.  Illinois Supreme Court Rule

341(h)(7) requires an appellant to include in the appellate brief an argument, which

contains the appellant's contentions on appeal and also the reasons for those arguments,

with citation of the authorities and the pages of the record relied on.  Ill. S. Ct. R. 341(h)(7)

(eff. Oct. 1, 2020).  It is well settled that a contention that is supported by some argument

but does not cite any authority does not satisfy the requirements of Rule 341(h)(7), and

bare contentions that fail to cite any authority do not merit consideration on appeal.  *People*

*v. Clinton*, 397 Ill. App. 3d 215, 224 (2009).  Because M.M. has not cited any authority for

this argument, we will not consider it on appeal.

¶ 24    M.M. next contends that the trial court's finding that the State proved by a

preponderance of the evidence that she violated a condition of her probation was against

the manifest weight of the evidence.  Specifically, M.M. noted that the allegation in the

State's petition to revoke probation provided specific dates that she allegedly violated her

curfew, but Johnson testified at the hearing that she could not recall the specific dates.

¶ 25    In a juvenile delinquency matter, the State must prove a violation of probation by a

preponderance of the evidence.  *In re Seth S.*, 396 Ill. App. 3d 260, 272 (2009).  On review,

this court will not disturb a trial court's ruling on a petition to revoke probation unless the

ruling was against the manifest weight of the evidence.  *Id.*  A judgment is against the

11

manifest weight of the evidence when the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence. *People v. Jackson*, 2012 IL App (1st) 103300, ¶ 13.

¶ 26 Here, in finding that the State proved by a preponderance of the evidence that M.M. violated her curfew, the trial court noted that there was unrebutted general testimony presented that Johnson was present in M.M.'s home at times when M.M. was required to be there but was not and that M.M. admitted to Johnson that she failed to observe her curfew. Although the allegations in the petition to revoke included specific dates, the court found that it was not convinced that only those specific dates must be proven to establish a probation violation. M.M. has cited no authority that indicates the court's finding was erroneous. Since M.M. admitted to failing to observe her curfew, and Johnson had firsthand knowledge of M.M. violating this condition of her probation, we find that the court's determination was not against the manifest weight of the evidence.

¶ 27 M.M.'s last argument on appeal is that the trial court abused its discretion in sentencing her to an indeterminate period in the Department. In particular, she contends that the court's finding that her confinement in the Department was necessary to ensure the protection of the public from the consequences of her criminal activity was against the manifest weight of the evidence.

¶ 28 The disposition of a delinquent minor rests within the sound discretion of the trial court. *In re T.M.*, 210 Ill. App. 3d 651, 657 (1991). Thus, we will not overturn a trial court's determination absent an abuse of that discretion. *In re Ashley C.*, 2014 IL App (4th) 131014, ¶ 22.

¶ 29 Section 5-710 of the Juvenile Court Act of 1987 provides the various dispositional alternatives available to a trial court as to a delinquent minor (705 ILCS 405/5-710 (West 2020)), including commitment to the Department (*id*. § 5-750). However, a court may commit a delinquent minor to the Department only if it finds the following:

> "(a) [the minor's] parents, guardian or legal custodian are unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor, or are unwilling to do so, and the best interests of the minor and the public will not be served by placement [outside the home], or it is necessary to ensure the protection of the public from the consequences of criminal activity of the delinquent; and (b) commitment to the Department *** is the least restrictive alternative based on evidence that efforts were made to locate less restrictive alternatives to secure confinement and the reasons why efforts were unsuccessful in locating a less restrictive alternative to secure confinement." *Id*. § 5-750(1).

¶ 30 In making a finding that secure confinement is necessary, the trial court must evaluate the following individualized factors: (1) the minor's age; (2) the minor's criminal background; (3) results of any assessments of the minor; (4) the minor's educational background, whether the minor was assessed for a learning disability, any services provided to the minor, and any disciplinary incidents at school; (5) the physical, mental, and emotional health of the minor; (6) whether any community based services were provided to the minor, and whether the minor was compliant with those services; and (7) the services within the Department that would meet the minor's individualized needs. *Id*.

¶ 31 Here, the evidence presented at the sentencing hearing indicated that M.M. had times of compliance with probation, but she was not consistent. When she was placed in detention, she consistently took her medication, and her behavior improved. However, once she was released, she would quit taking the medication, and she would become

13

verbally combative and noncompliant with the rules at home and school. Johnson testified that every opportunity, other than confinement to the Department, had been taken to mitigate M.M.'s behavior without success. She had numerous police contacts since 2019, had been physically violent with her family members, had two suspensions from school, was no longer attending school, and recently admitted to drinking alcohol and some cocaine use. M.M.'s behavior also negatively impacted her grandmother and sister's mental and physical health.

¶ 32    In finding that confinement was necessary, the trial court indicated that M.M. was given numerous opportunities to make behavioral changes during the almost two years that the case was ongoing and, although she expressed remorse for her behavior, it did not believe that she was genuine and was instead just trying to receive a favorable outcome. Once she realized that her continued manipulations would no longer be successful, she became indifferent and defiant, and the defiance extended to every part of her life. The court noted that she was disrespectful to her teachers, made no effort to follow the rules, and was engaging in self-destructive behavior. Although the court acknowledged that she suffered from mental health issues, which impacted her ability to follow the rules, she refused to take her medication. The court indicated that it did not have any faith in M.M. complying with the terms of probation, and there were no other viable alternatives for sentencing. Thus, the record supports the court's finding that confinement was necessary to ensure the protection of the public from the consequences of M.M.'s criminal activity and demonstrates the reasons why there were no remaining sentencing alternatives for M.M. Accordingly, we do not find that the court abused its discretion in sentencing M.M.

to an indeterminate term in the Department. We must, therefore, affirm the trial court's judgment.

¶ 33                                III. CONCLUSION

¶ 34    For the foregoing reasons, the judgment of the circuit court of Coles County is hereby affirmed.


¶ 35    Affirmed.